# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAUSE OF ACTION INSTITUTE,

    *Plaintiff*,

    v.

U.S. DEPARTMENT OF THE ARMY,

    *Defendant.*

Civil Action No. 16-1020 (RDM)

## MEMORANDUM OPINION AND ORDER

The Department of the Army ("Army") is subject to the requirements of the Freedom of

Information Act ("FOIA"). *See* 5 U.S.C. § 552(e). The White House Office—which is a unit of

the Executive Office of the President ("EOP")—is not.[1] *See Kissinger v. Reporters Comm. for*

*Freedom of the Press*, 445 U.S. 136, 156 (1980) (citing H.R. Conf. Rep. No. 93-1380, at 15

(1974)). Plaintiff Cause of Action Institute ("COA Institute") thus seeks records from the Army

that would shed light on the activities of the White House Office, along with other offices in the

EOP. Lurking, then, in this seemingly run-of-the-mill FOIA case is a principle of respect for the

Executive's "'constitutional prerogative' to maintain[] the autonomy of its office and safeguard[]

the confidentiality of its communications.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d

208, 224 (D.C. Cir. 2013) ("*Judicial Watch I*") (quoting *Cheney v. U.S. Dist. Court*, 542 U.S.

---

[1] Although "FOIA's definition of 'agency' . . . literally includes '*any* . . . establishment in the executive branch of Government (including the Executive Office of the President),' 5 U.S.C. § 552(f)," it "does not include EOP units," like the White House Office, "whose sole functions are to advise and assist the President." *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 567 (D.C. Cir. 1996).

367, 385 (2004)).  Which, if any, records at issue in this case fall beyond FOIA's reach, however, requires a fact-intensive inquiry that the Court cannot resolve on the present record.

The FOIA request at issue asked that the Army release "all records of communications with any employee of the Executive Office of the President . . . , including but not limited to the Office of the White House Counsel . . . , concerning telephone and/or video conferences hosted and/or arranged by the military."  Dkt. 1-2 at 2.  The request included "any email requesting that a conference line be opened, as well as any subsequent confirmation e-mail or related correspondence" for the period between January 1, 2015 and June 26, 2015.  *Id.*  In order to set up a video or telephone conference, EOP staff would submit a request using software provided to the EOP by the Army and "housed on an Army computer server."  Dkt. 29 at 7–8.  That software then automatically generated and sent a confirmation email from an account with an Army domain name.  *See id.*; Dkt. 1-5 at 18.

In response to the FOIA request, the Army released some documents, with redactions for personnel privacy pursuant to FOIA Exemption 6.  Dkt. 25-1 at 8.  The Army declined to search for or to release emails sent from the address "system.manager@conus.army.mil," which provided conference information in response to requests from EOP employees, however, because only EOP staff—and not Army staff—were involved in arranging or hosting the conference calls.  *Id.*  In the Army's view, these records fell outside the scope of the FOIA request because the calls were not "hosted or arranged" by the military.  *Id.*  The Army then moves for summary judgment, arguing that it had conducted an adequate search for responsive records and that its withholdings pursuant to Exemption 6 were permissible.  *Id.* at 6.  Plaintiff opposes the Army's motion and cross-moves for summary judgment.  Dkt. 26 at 1.  In opposing Plaintiff's cross-motion, the Army raised, for the first time, the contention that the email accounts that it declined

to search did not contain "agency records" of the Department of the Army. Dkt. 29 at 11–15. Rather, according to the Army, it merely provided software and a computer server for the use of the EOP, and the records at issue were owned and controlled by the EOP. *Id.* Plaintiff disagrees and argues that, in any event, the Army has failed to carry its burden for purposes of summary judgment. Dkt. 30 at 8.

For the reasons explained below, the Court will grant in part and deny in part the Army's motion and will deny Plaintiff's cross-motion without prejudice.

## I. BACKGROUND

On June 26, 2015, the COA Institute submitted a FOIA request to the Army seeking records related to the Army's role in "host[ing] and/or arrang[ing]" telephone and video conferences for EOP staff. Dkt. 1 at 5 (Compl. ¶ 14). That request sought "all records of communications with any employee of [EOP] . . . including but not limited to the Office of the White House Counsel . . . , concerning telephone and/or video conferences hosted and/or arranged by the military" between January 1, 2015 and the date of the request. *Id.* (Compl. ¶ 14–15). The request specified that "[r]esponsive records would include any e-mail requesting that a conference line be opened, as well as any subsequent confirmation email or related correspondence." *Id.* at 6 (Compl. ¶ 16).

The White House Military Office ("WHMO") is—despite its name—part of the Department of Defense ("DOD") and is "tasked with supporting certain functions of the EOP." Dkt 25-1 at 7. The White House Communications Agency ("WHCA") is part of the WHMO and is the "[DOD] organization tasked to provide telecommunications support and services to the President and his staff." Dkt. 25-4 at 6 (Herrington Decl. ¶ 20). Both of these offices are subject to FOIA. *See* 32 C.F.R. § 286.3 (identifying the office that initially processes FOIA requests

submitted to the WHMO).  The COA Institute's FOIA request explained that the records that it

sought "may be maintained by the White House Military Office and/or the White House

Communications Agency."  *Id.* at 6 (Compl. ¶ 17).

In September 2015, several months after Plaintiff submitted its FOIA request, the Army

sent Plaintiff a letter asserting that it had performed a search of the "Chief of Legislative Liaison

. . . , Defense Information System Agency . . . , and Army's Enterprise Service desk" for

responsive records and had concluded that "no responsive documents exist under our purview."

Dkt. 1-4 at 2.  The COA Institute then timely filed an administrative appeal of the Army's

determination.  Dkt. 1-5 at 2.  Attached to this appeal was an email concerning a teleconference

sent from "system.manager@conus.army.mil" ("the CONUS email account").  *See* Dkt. 1-5 at

18.  Plaintiff argued that the CONUS email account, which is purportedly housed on an Army

server, should have been searched for responsive records.  *Id.* at 3–4.

On May 5, 2016, the Army notified Plaintiff that it had not yet processed the FOIA

request because it handles FOIA appeals in the order they are received.  Dkt. 1-7 at 2.  On May

31, 2016, more than eleven months after the submission of the request, Plaintiff brought suit

seeking release of the requested records.  *See* Dkt. 1.  The Army ultimately released fewer than

250 pages of records in response to the FOIA request.  Dkt. 25-1 at 3 (citing Dkt. 22 at 1).  In the

records released, moreover, the Army redacted the "names and personally identifying

information of all military personnel at the rank of Colonel (O6) and below, and all civilians at

the rate of GS-15 and below," with certain limited exceptions.  Dkt. 25-4 at 6–7 (Herrington

Decl. ¶ 23–24).

The Army also determined that the CONUS emails were generated by software "housed

on an Army servicer, resulting in the use of an 'army.mil' extension."  Dkt. 25-3 at 3

(DeAgostino Decl. ¶ 11). Because the Army determined that "only EOP [personnel] were involved in the creation of" individual emails from that account "and in hosting or arranging the conference call[s] referenced therein," it declined to search the CONUS email account for responsive documents. *Id.* at 3–4 (DeAgostino Decl. ¶ 11–13). The Army determined, in short, that the CONUS emails were not called for by the FOIA request because they did not reflect any role by the Army in "host[ing] and/or arrang[ing]" telephone and video conferences for EOP staff. *Id.* (DeAgostino Decl. ¶ 13).

On June 8, 2018, the Army moved for summary judgment, contending that it had conducted an adequate search for responsive records and had properly redacted the names of various employees on the released records pursuant to FOIA Exemption 6. *See* Dkt. 25-1 at 6. In support of that motion, the Army provided declarations from Paul DeAgostino, the Senior Counsel to the Chief Attorney and Legal Services, Office of the Administrative Assistant to the Secretary of the Army, and from Mark Herrington, an Associate Deputy General Counsel in the Office of General Counsel at the DOD. *See* Dkt. 25-3; Dkt. 25-4. On July 9, 2018, Plaintiff filed its opposition to the Army's motion for summary judgment and cross-moved for summary judgment, contending that the Army had not conducted an adequate search because it had failed to search the CONUS email account and that the Exemption 6 redactions were improper. *See* Dkt. 26-1 at 7–8. In opposing Plaintiff's cross-motion, the Army raised for the first time its contention that the CONUS emails were not "agency records" of the Army but, rather, were created and controlled by the EOP. Dkt. 29 at 11–15.

## II. LEGAL STANDARD

FOIA matters are typically resolved on a motion for summary judgment, which requires the moving party to "show that there is no genuine dispute as to any material fact and [that it] is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). FOIA authorizes courts "to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). Accordingly, at the summary judgment stage, the Court must discern whether there is any "genuine dispute of material fact" as to whether "any agency records" have been "improperly withheld." *See id.*; Fed. R. Civ. P. 56(a).

FOIA first requires an agency to conduct "a 'search reasonably calculated to uncover all relevant documents.'" *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (citation omitted). To demonstrate the adequacy of the search, the agency must provide "a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Agencies may withhold responsive documents uncovered in that search only if those documents fall within one of the exemptions enumerated in 5 U.S.C. § 552(b). Insofar as the agency withholds responsive records pursuant to those exemptions, it must provide an index of that information and the justification that supports withholding each record. *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).

## III. ANALYSIS

In the course of briefing, the parties have narrowed their dispute to two areas: First, whether the FOIA request sought emails sent from the CONUS email account and, if so, whether those emails are properly considered "agency records" such that this Court may order the Army to produce them pursuant to 5 U.S.C. § 552(a)(4)(B). Second, whether the Army's redactions of employees' names and other personally identifying information pursuant to FOIA Exemption 6, *id.* § 552(b)(6), were proper. The Court addresses each issue in turn.

6

**A.    The CONUS Email Account**

At the time the case came to the Court, the parties' dispute regarding the CONUS email account centered on the question whether Plaintiff's FOIA request called for the records contained in that account.  That request sought records of communications concerning telephone and video conferences "hosted and/or arranged by the military."  Dkt. 1-2 at 2.  In the Army's view, Army personnel played no role in hosting or arranging the conferences; rather, the process of hosting and arranging telephone and video conferences was handled exclusively by EOP staff.  Dkt. 25-3 at 3–4 (DeAgostino Decl. ¶ 11–12).  The Army merely provided the software and housed the server that the EOP staff use to host and arrange the conferences.  Dkt. 29 at 8.  Plaintiff, on the other hand, posited that the scheduling emails sent from the CONUS email account were precisely what it sought, Dkt. 30 at 8, and any doubt about that was put to rest by its administrative appeal, which included a sample email sent from the CONUS email account, Dkt. 1-5 at 2, 18.

1.    *The Army's Motion for Summary Judgment Regarding the CONUS Email*

The Court is skeptical of the Army's reading of the FOIA request, especially in light of the agency's "duty to construe a FOIA request liberally."  *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) (citation omitted).  To be sure, if the request merely asked for records of communications concerning conferences that the military arranged, the Army's reading of the request might make sense.  The very next sentence of the request, however, explains that Plaintiff was seeking "any e-mail requesting that a conference line be opened, as well as *any subsequent confirmation e-mail* or related correspondence."  Dkt. 1-2 at 2 (emphasis added).  That clarification is best understood to bring the emails at issue within the scope of the FOIA request.  The CONUS emails were

communications with EOP employees that confirmed telephone and/or video conferences. Indeed, the subject line of each email indicated that the email was a "Confirmation Notice – Audio Conference," and the body of each email listed the conference leader, the conference requester, the start date and time, and end date and time, and the number of participants. Dkt. 1 at 3 (Compl. ¶ 5).

In reaching a contrary conclusion, the Army places dispositive weight on the preceding sentence of the request, which asks about telephone and video conferences "hosted and/or arranged by the military." Dkt. 1-2 at 2. In the Army's view, the records at issue had nothing to do with conferences hosted or arranged by the military because EOP staff submitted requests for the conferences and the software that the Army provided automatically generated the CONUS emails without any involvement of Army personnel. Dkt. 25-1 at 14. But that is too cramped a reading of the request; it assumes, without basis, that the request excluded the automated "arrange[ment]" of calls. *Id.* Given the clarity of the follow-on sentence, it is difficult to construe the request to exclude confirmatory emails generated using software "housed on an Army server." Dkt. 25-3 at 3 (DeAgostino Decl. ¶ 11); *see also LaCedra v. Exec. Office for U.S. Att'ys*, 317 F. 3d 345, 348 (D.C. Cir. 2003) (rejecting agency interpretation of request that rendered portions of the request surplusage where the result is an "improbable" construction). Any doubt about what records Plaintiff sought, moreover, was resolved by its administrative appeal, which attached a sample email. Dkt. 1-5 at 2. The Army, accordingly, had a sample of exactly what Plaintiff sought *before* the Army conducted *any* search for responsive records.

Congress amended FOIA in 1974 to replace the phrase "request for identifiable records" with the more forgiving phrase "request for records which . . . reasonably describes such record." *Truitt v. Dep't of State*, 897 F.2d 540, 544 (D.C. Cir. 1990). It did so to "'make[] explicit the

liberal standard for identification'" of the records sought, and to prevent agencies from using

"'identification requirements as an excuse for withholding documents.'" *Id.* at 544–45 (citation

omitted). Applying that liberal standard here, the Army could have—and should have—

construed Plaintiff's request to include emails sent from the COUNUS account confirming

telephone and video conferences. The Court, accordingly, is unconvinced that the Army is

entitled to summary judgment with respect to the CONUS emails on the sole ground it asserted

in its motion for summary judgment.

> 2.  *Plaintiff's Cross-Motion for Summary Judgment Regarding the CONUS Email*

The Court is also unconvinced, however, that Plaintiff is entitled to prevail on its cross-

motion for summary judgment. In opposing that motion, the Army raised for the first time an

alternative, and more persuasive, defense. It now argues that the records at issue are not—and

never were—"agency records" of the Army. Dkt. 29 at 11–15. Rather, in the Army's view, the

records belonged to, and were controlled by, the EOP, and, as a result, it had no obligation or

right to release them. Plaintiff takes issue with that contention on both procedural and

substantive grounds. It first argues that the Army has failed to offer admissible and sufficient

evidence in support of its contention and that, at minimum, it should be allowed to take

discovery on the issue. And, it argues that the Army's theory, in any event, proves too much; it

would mean, in Plaintiff's view, that records relating to conference calls involving White House

Office Staff could never be obtained under FOIA. For the reasons discussed below, the Court is

persuaded by the Army's legal argument but agrees with Plaintiff that the evidence the Army has

offered to date is insufficient to meet the Army's burden. That does not mean, however, that

Plaintiff is entitled to summary judgment. Rather, further factual development is required before

the Court can definitively resolve the question whether the CONUS emails are "agency records" of the Army.

The D.C. Circuit's decision in *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208 (D.C. Cir. 2013), guides the Court's inquiry here. *See also ACLU v. CIA*, 823 F.3d 655 (D.C. Cir. 2016). There, Judicial Watch requested records from the Secret Service documenting every visitor to the White House Complex over a period of seven months. *Judicial Watch I*, 726 F.3d at 211. Because all visitors to the White House must be cleared by the Secret Service, the Secret Service maintained records of each visitor, the White House passholder who requested that visitor's entrance, and the name and details of the visit. *Id.* at 212. This data was "enter[ed] into a computer" by the passholder and then automatically forwarded to the Secret Service "for processing." *Id.* The White House and the Secret Service entered into a memorandum of understanding, which limited the Secret Service's ability to use the records for purposes other than clearing visitors and required the ultimate return of the records to the White House. *Id.* at 213. The Secret Service withheld these records from Judicial Watch on the grounds that they were not "agency records" for purposes of FOIA. *Id.* at 214.

In general, "a document is not an 'agency record' unless [the] agency both (1) 'create[d] or obtain[ed]' it, and (2) 'controls' it at the time of the FOIA request." *Id.* at 217 (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144–45 (1989)). Because the D.C. Circuit easily concluded that the Secret Service had "obtained" the records at issue, the court's analysis focused on the more difficult question "whether [the] agency ha[d] sufficient 'control' over a document to make it an 'agency record.'" *Id.* at 218 (quoting *Tax Analysts v. U.S. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)). "In the usual case," courts look to the following four factors to answer that question: "(1) the intent of the document's creator to retain or

relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files." *Id.* (quoting *Tax Analysts*, 845 F.2d at 1069). The D.C. Circuit applied these factors and concluded that they "point[ed] in different directions, with different intensities." *Id.* at 220.

Faced with this "uncertain result" and the agency's burden to demonstrate its lack of control, *id.* at 220, the court went on to consider whether the "'special policy considerations' at stake" counseled against disclosure, *id.* at 221–22. In doing so, the court applied a slightly different test, borrowed from cases considering whether Congress—an entity that, like the White House Office, is not covered by FOIA based, at least in part, on separation-of-powers concerns—had control over the records for purposes of FOIA. *Id.* at 221-22. The central focus of that test is whether "Congress [or the FOIA-exempt government office] has manifested its own intent to retain control" because, if it has, "the agency—by definition—cannot lawfully 'control' the documents." *Id.* at 222 (quoting *United We Stand America, Inc. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004)). The D.C. Circuit then held that the memorandum of understanding evidenced the requisite intent by the White House to retain control over the White House visitors records such that they were not "agency records" under FOIA. *Id.* at 224. The D.C. Circuit buttressed this conclusion, moreover, by emphasizing the substantial separation-of-powers concerns that would arise if Congress could condition the President's reliance on outside agencies to perform certain necessary White House functions on the disclosure of information regarding the specific meetings of the President's staff. *Id*. at 224–26.

The Court of Appeals reached a different conclusion, however, with respect to records involving EOP offices, such as the Office of Management and Budget, whose "'sole function' is

not to 'advise and assist the President.'" *Id.* at 232. As the court observed, "[t]hose offices are 'agencies' under FOIA, and their records are 'agency records' subject to disclosure," and disclosure of their records does not raise the same special policy considerations applicable to the White House Office. *Id.* Because no special policy considerations weighed against disclosure, because the "four-part control test" was "indeterminate," and because "the burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records,'" the court held that this set of records was subject to disclosure in response to Judicial Watch's FOIA request. *Id.* (citation omitted).

The issues presented here are similar to those addressed in *Judicial Watch I*, and thus the Court must follow the trail blazed in that case. That trail, however, is fact-intensive, and, as explained below, the Court concludes that it cannot definitively resolve the question whether the CONUS emails are Army, EOP, or both Army and EOP records on the current record. Most notably, the Army premises its argument in large part on the provisions of a Memorandum of Understanding ("MOU") between the EOP and the Army that is similar to the one between the White House and the Secret Service at issue in *Judicial Watch I*. But, as Plaintiff correctly observes, the MOU that the Army filed with its opposition brief covers only fiscal year 2011— and that is not the year at issue in this case. Plaintiff also questions the basis for various assertions contained in the declaration that the Army has offered in support of its defense. The declarant, Dr. Sherry Sarratt, Chief of the Systems Engineering & Enterprise Services Division of the Army Material Command, attests, for example, that "to the best of [her] knowledge, the only time that [Army Material Command] personnel ever accessed EOP data was in assisting EOP personnel during an initial set up period." Dkt. 29-2 at 2 (Sarratt Decl. ¶ 7). That is an important premise of the Army's argument, yet Sarratt does not indicate whether she has

personal knowledge about any such access or what, if anything, she did to investigate. As explained below, these factual questions are potentially dispositive and preclude the Court from resolving the status of the CONUS email account on the present record. *See* Fed. R. Civ. P. 56.

The first factor under the four-part control test looks to "the intent of the document's creator to retain or relinquish control over the records." *Judicial Watch I*, 726 F.3d at 218 (quoting *Tax Analysts*, 845 F.2d at 1069). But, here, as in *Judicial Watch I*, there is "some uncertainty as to which entity 'created'" the records and thus whose intent matters for purposes of this inquiry. *Id.* at 217. In *Judicial Watch I*, that uncertainty was resolved by the "unequivocal" terms of the memorandum of understanding, which specified that "the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all [White House Access Control System] records." *Id.* (citation omitted). Here, the Army points to the 2011 version of the MOU between the EOP and the Army, which provided that "[t]itle to and ownership of any data placed in the AMC QuickBase system by the EOP . . . will belong to the EOP at all times." Dkt. 29 at 14 (quoting Dkt. 29-1 at 4). Assuming that the version of the MOU operative in fiscal year 2015 contained the same language, this factor would likely weigh in favor of the Army. Although the Army suggests that the the provision was in effect in fiscal year 2015, the existing records does not definitively resolve that question.

Analysis of the next factor—"the ability of the agency to use and dispose of the record as it sees fit"—similarly weighs in the Army's favor, at least based on the facts that the Army asked the Court to assume. *Judicial Watch I*, 726 F.3d at 218. The version of the MOU between the EOP and the Army before the Court contains a provision that mirrors one in *Judicial Watch I*. That provision precludes the Army from disposing of records "as it sees fit," *id.*, barring it from "deleting or modifying" or "disclosing . . . to any party for any reason" any of the data "without

express, written direction from [the] EOP." Dkt. 29-1 at 2. In *Judicial Watch I*, the D.C. Circuit

held that, in light of the memorandum of understanding's limitations on use and the standard

practice of the Secret Service of returning the files to the White House, the second factor

weighed in favor of the agency. *Judicial Watch I*, 726 F.3d at 218–19. The Court cannot

definitively resolve the question whether the same conclusion applies here, however, both

because the Court has seen only the fiscal year 2011 MOU and because the Army's declarant

merely asserts that, "absent EOP action," Army personnel "did not have [the] credentials that

would enable them to access" this data, Dkt. 28-2 at 2 (Sarratt Decl. ¶ 7). This leaves

unanswered the question whether the EOP took any "action" providing the Army personnel with

"[a] username and password," and, as noted above, the declarant merely asserts that, "to the best

of [her] knowledge," Army personnel only had access to the "EOP data . . . during an initial set

up period," without explaining what the declarant did to inform her conclusion. *Id.*

The third factor of the control test requires the Court to consider whether agency

personnel have "read or relied upon the documents." *Judicial Watch I*, 726 F.3d at 219. This

factor weighed against the Secret Service in *Judicial Watch I* because Secret Service personnel

"read and rel[ied] upon the documents . . . for the limited purposes the records serve[d]: to enable

the [Secret] Service to perform background checks and verify admissibility at the time of a

visitor's entrance." *Id.* Here, in contrast, it appears that the CONUS email account, by design,

did not require any Army personnel to read or to rely on any documents generated by the system.

To be sure, there is a certain awkwardness to applying this factor to government software that

automatically generates records, particularly in a world in which important government actions

may, over time, become increasingly automated.[2]  Insofar as this factor does carry any weight in this context, it points—unlike in *Judicial Watch I*—modestly in favor of the government, because, at least as far as the current record reflects, the Army did not use the records in the performance of any of its duties.

The fourth and final factor—the "degree to which the document was integrated into the agency's record system or files," *id.*—once again requires further factual development.  The Sarratt declaration attests that "[a]t no time was EOP data integrated into any other Army records or files, as the data remained partitioned off exclusively for EOP use," Dkt. 29-2 at 3 (Sarratt Decl. ¶ 8), and that "a copy of the emails themselves were not retained on an Army server at any point," *id.* (Sarratt Decl. ¶ 10).  Of course, if this means that the Army never possessed the records that Plaintiff sought, that may well resolve matters; the Army could not release records it did not have.[3]  *See Kissinger*, 445 U.S. at 154–55.  Moreover, even putting that practicality aside, if the Army could establish that the CONUS email account automatically generated responses to meeting requests, without maintaining a copy of the incoming or outgoing email for even a brief time—on a backup system or otherwise—that fact would weigh substantially in the Army's favor.  But, once again, the present record does not provide sufficient detail for the Court

---

[2]  For instance, the question of agency "use" would be more difficult if the automated records reflected government decisions, such as whether to grant or deny benefits.

[3]  Elsewhere in the declaration, Sarratt attests that, after the FOIA request was submitted, the Army stopped providing the QuickBase software to EOP and therefore asked EOP to "remove its data from the [Army's] server by . . . 2016." Dkt. 29-2 at 4 (Sarratt Decl. ¶ 13).  Because the Court concludes that there is a material dispute of fact as to whether these records were "agency records" at the time the request was made, it need not address the separate *Kissinger* question regarding the scope of the agency's obligation to produce records that are no longer in its possession. *See Kissinger*, 445 U.S. at 154–55.

to resolve that important question. More than a sentence is necessary to explain how the server operated.

In sum, it is possible that all four factors might weigh unambiguously in the Army's favor, thus resolving the issue without reaching the separate, special policy considerations test. If so, that would provide the Army with a defense with respect to all of the CONUS emails. Alternatively, it is possible that the four-factor test might ultimately yield an uncertain or indeterminate result, as in *Judicial Watch I*. *See Judicial Watch I*, 726 F.3d at 220. If so, the Court would then need to apply the special policy considerations test, which could result in a decision, like that in *Judicial Watch I*, requiring the release of some of the records, but not the emails scheduling telephone or video conferences for the White House Office. Or, it is possible that the Army will be unable to meet its burden of demonstrating that the fiscal year 2015 records at issue were subject to an MOU, like the one the Army has provided for fiscal year 2011. Applying the *Judicial Watch I* framework is fact-intensive, and it requires judicial sensitivity to the important separation-of-powers considerations that animate the special considerations test. For present purposes, however, the Court merely holds that there is a genuine dispute of material fact that precludes the Court from granting Plaintiff's motion for summary judgment. *See* Fed. R. Civ. P. 56(a).

**B.** **Exemption 6 Withholdings**

The Army also seeks summary judgment on the ground that its redactions of certain personally identifying information of its employees was proper under FOIA Exemption 6. "Exemption 6 protects information about individuals in 'personnel and medical files and similar files' when its disclosure 'would constitute a clearly unwarranted invasion of personal privacy.'" *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 257 (D.D.C. 2016) (quoting 5 U.S.C. §

552(b)(6)).  Courts must read "'similar files' broadly to include any '[g]overnment records on an individual which can be identified as applying to that individual.'"  *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 303 (D.D.C. 2007) (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982)).  In this circuit, that means the "exemption can sweep in 'bits of personal information, such as names and [email] addresses.'"  *Edelman v. Sec. & Exch. Comm'n*, 239 F. Supp. 3d 45, 55 (D.D.C. 2017) (quoting *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) ("*Judicial Watch II*")).

An agency may not withhold or redact a record simply because it contains personally identifying information.  Rather, the information "must be 'of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion.'"  *Id.* (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)).  The Court must thus "weigh[] 'the private interest involved (namely the individual's right of privacy) against the public interest (namely, the basic purpose of [FOIA], which is to open agency action to the light of public scrutiny).'"  *People for the Am. Way Found.*, 503 F. Supp. 2d at 304 (quoting *Judicial Watch II*, 449 F.3d at 153).

## 1.  *Foreseeable Harm Requirement*

As a threshold matter, Plaintiff contends that the FOIA Improvement Act of 2016 imposed a series of changes that "raise[d] the standard by which an agency must evaluate its withholdings."  Dkt. 27-2 at 23.  As Plaintiff correctly notes, those amendments permit agencies to withhold information under FOIA "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I).  In Plaintiff's view, this heightened standard is not satisfied here.  In the Army's view, the amendments merely clarified existing law, and, in any event, the standard is met here.  But both parties merely

assume that those amendments apply to Plaintiff's FOIA request, even though the FOIA Improvement Act of 2016 was signed into law over a year after Plaintiff submitted its FOIA request to the Army, and it and explicitly applies only to "request[s] for records . . . made after the date of enactment." FOIA Improvement Act of 2016, Pub. L. No. 114-185, § 6, 130 Stat. 538. The Court, as a result, has no occasion to address the effect of those amendments on the standards for withholding under FOIA.

2.   *Balancing the Private and Public Interest*

The Court then turns to the core of the dispute between the parties: whether the redactions were justified under Exemption 6. The Army asserts that the redactions were limited to Army personnel below the rank of Colonel (O6) and civilian personnel below the GS-15 pay grade who did not otherwise interact with the press. Dkt. 25-1 at 19–20 (citing Herrington Decl. ¶¶ 23–24). And, the Army justifies these withholdings by asserting that all military personnel face added threats of harassment since the September 11, 2001 attacks, this "threat is greater than the threat to most other federal employees," and the threat is particularly acute here because "[m]any of [the individuals at issue] serve in sensitive DOD positions, such as in the WHCA and WHMO, primarily supporting the President and his staff on a daily basis." Dkt. 25-4 at 6–7 (Herrington Decl. ¶¶ 23–25).

Plaintiff first contends that the Army has insufficiently justified these redactions because it has not provided a *Vaughn* index that adequately describes the rank and job duties of the individuals whose information is being withheld. Dkt. 26-1 at 18–19. But the point of a *Vaughn* index is to provide sufficient information about each withholding to enable the requester and the courts to evaluate the legitimacy of the withholding. *See Vaughn*, 484 F.2d at 827–28. Thus, where a blanket justification is given, there is no need for individualized, indexed information to

back up that withholding—insofar as that blanket justification is valid. To determine whether redactions under Exemption 6 are permissible, the Court must identify the privacy interest of the individuals and the public interest in the information being sought, and then weigh those interests against one another to determine whether the information is "of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." *Edelman*, 239 F. Supp. 3d at 55 (quoting *Norton*, 309 F.3d at 32).

Low-level Department of Defense and Army personnel involved in EOP scheduling have at least some privacy interest in their names. The D.C. Circuit has described "the privacy interest of an individual in avoiding unlimited disclosure of his or her name and address" as "significant." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989). Courts have repeatedly recognized that government employees possess some privacy interest even in just their names. *See, e.g.*, *Hunton & Williams LLP v. U.S. EPA*, 248 F. Supp. 3d 220, 257 (D.D.C. 2017); *Pinson v. U.S. Dep't of Justice*, 177 F. Supp. 3d 56, 84 (D.D.C. 2016). The Herrington declaration, moreover, attests that DOD employees, like those at issue here, may face harassment or worse if their identities are made public. Dkt. 25-4 at 6–7 (Herrington Decl. ¶¶ 23–25); *see also SafeCard Servs. Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (explaining that agency declarations submitted in FOIA cases are afforded "a presumption of good faith"). That factual assertion comports with common sense. Accordingly, the Court finds that the low-level DOD personnel whose names were redacted have a privacy interest in their names and other identifying information.

The public interest in the names of the employees at issue is not so easy to discern. Plaintiff asserts that it is seeking to "understand 'the manner in which agencies, the White House, and the military (as communications facilitator) conduct audio or visual conferences.'"

Dkt. 27-2 at 21 (quoting Dkt. 1-2 at 3). And, it asserts that knowing "who is involved in facilitating" these conferences "is an integral part" of the investigation. *Id.* (emphasis omitted). But it is far from clear why the public would have any interest in which relatively low-ranking Army and DOD personnel are responsible for setting up these teleconferences, nor does Plaintiff make any plausible argument in this regard. *See id.* Plaintiff does not assert that these individuals were participants in the conferences such that the redactions leave the public in the dark about key aspects of any "agency decisionmaking process." *See Hunton & Williams LLP*, 248 F. Supp. 3d at 258. As far as the Court can discern, these individuals were merely ministerial facilitators of meetings who had no role themselves in any decisionmaking process.

Because "something, even a modest privacy interest, outweighs nothing every time," *Consumers' Checkbook, Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1056 (D.C. Cir. 2009) (internal quotation and citation omitted), the Court concludes that the privacy interest of the employees outweighs any public interest in disclosure and consequently awards summary judgment in favor of the Army with respect to its redactions under Exemption 6.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment, Dkt. 25, is hereby **GRANTED** in part and **DENIED** in part without prejudice and Plaintiff's Cross-Motion for Summary Judgment, Dkt. 26 is **DENIED**.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 29, 2019